# DWYER IMANAKA SCHRAFF KUDO MEYER & FUJIMOTO

ATTORNEYS AT LAW ❖ A LAW CORPORATION

---

1800 PIONEER PLAZA ❖ 900 FORT STREET MALL ❖ HONOLULU, HAWAII 96813 ❖ POST OFFICE BOX 2727 ❖ HONOLULU, HAWAII 96803
TELEPHONE: (808) 524-8000 ❖ FACSIMILE: (808) 526-1419

JOHN R. DWYER, JR.
MITCHELL A. IMANAKA
PAUL A. SCHRAFF
BENJAMIN A. KUDO
WILLIAM G. MEYER, III
WESLEY M. FUJIMOTO
RONALD V. GRANT
JON M.H. PANG
BLAKE W. BUSHNELL
ADELBERT GREEN
RICHARD T. ASATO, JR.
SCOTT W. SETTLE

DARCIE S. YOSHINAGA
LAWRENCE I. KAWASAKI
STACY E. UEHARA
KRIS N. NAKAGAWA
JEFFERY S. WERBELOW
LORI ANN K. KOSEKI
TROY T. FUKUHARA
KATY Y. CHEN
ROGER B. McKEAGUE
Of Counsel:
RANDALL Y. IWASE
R. BRIAN TSUJIMURA

THIS ORIGINAL DOCUMENT
IS A CONFIRMATION OF
THE FAXED COPY

March 13, 1996

VIA TELECOPIER

Steven B. Jacobson, Esq.
Torkildson Katz Jossem Fonseca
 Jaffe Moore & Hetherington
Amfac Building, 15th Floor
700 Bishop Street
Honolulu, Hawaii 96813-4187

Re: *Morgan v. Dimiceli*; Supreme Court No. 19552
*Morgan v. Kerr, et al.*; Fifth Circuit Court Civil No. 93-0199

Dear Mr. Jacobson:

This is in response to your letter of March 5, 1996 and this letter also constitutes a continuing part of our mutual attempt to compromise the above matter within the meaning of Rule 408 of the *Hawaii Rules of Evidence*.

First of all, the assertion that your clients lack a factual basis for evaluating Ms. Dimiceli's financial means is simply not correct. In point of fact, you explored her financial condition in detail in her deposition. When she sold her shopping center lease to the Princeville Corporation, she used the proceeds to buy the Pupu Pit. She told you that in her deposition. She also told you that the Pupu Pit was destroyed when the building next door collapsed on it thirty days after Hurricane Iniki. Finally, she told you that there was no insurance recovery; the Pupu Pit was a total loss. I cannot help it if your clients are obtaining false information from someone else concerning that.

Similarly, the information your clients claim to have concerning the damage to her house is erroneous. The damage to the house, caused by Hurricane Iniki, was extensive. The entire roof was destroyed, a tree went through one end of the house, all of the drywall within the house was destroyed by water, the carpeting, furniture and all of Ms. Dimiceli's personal belongings were wiped out. The total amount paid to Ms. Dimiceli for the damage to the house and all of her personal belongings was approximately $136,000. Those funds were used to pay for the repair of the house (which cost over $55,000) to replace her personal

**EXHIBIT 1022**

Steven B. Jacobson, Esq.
March 13, 1996
Page 2

property, to pay for her living expenses during the six months that she remained on Kauai after Hurricane Iniki without being able to operate her business, and to pay for the downpayment which she made on her house in Oregon, and the downpayment she loaned to her manager for the manager's house in Oregon. Again, Ms. Dimiceli told you about those amounts in her deposition. You asked her about everything which she owns, and she answered your questions. I cannot respond to the unsubstantiated rumors.

The fact is that if Ms. Dimiceli had $50,000, or the means to pay $50,000, I would, in the strongest terms, recommend against any settlement with your clients. The fact is that Ms. Dimiceli does not have the financial wherewithal to pay $50,000. I do not know how else to respond to the untrue rumors which you and your clients are apparently accepting as "information." If your clients are expecting $50,000, they might as well demand $500,000, or $5 million: it is simply not financially doable.

Concerning the assignment of claims, I believe that your letter suggests a way to deal with this without the concomitant requirement for an indemnification. I cannot agree to any assignment which does not have an indemnification back. Similarly, I can understand your clients' reluctance to grant an indemnification for claims which they cannot evaluate. However, at the same time, I cannot ask my client to make representations to your clients that the Nimkies or someone else would not have a defense or counterclaims to raise in response to any assigned claims.

In your letter, you suggested that the Morgans might be willing to agree to reassign any assigned claims back to Ms. Dimiceli once the Morgans recovered what they are owed. I believe the Morgans can recover everything they are owed based upon the Morgans own claims, without the need for any assignment. That would avoid the problem of an indemnification as well as the problem of asking my client to make representations concerning assigned claims.

I would suggest that in lieu of any assignment of my client's claims, she would agree to subordinate her right to collect against the Nimkies or Mr. Kerr to your clients' judgment. As for recovering something from the Nimkies, you already have a default against them in this action. We would agree not to oppose your clients' obtaining a default judgment in whatever amount the Court will grant you against the Nimkies. My client would be willing to subordinate to that judgment. Frankly, I do not believe that any claims my client has against the Nimkies would be anywhere near the magnitude of the judgment which Judge Masuoka appears prepared to enter against the Nimkies in favor of your clients. I think you would simply be gilding the lily to seek an assignment of my client's claims against the Nimkies. In addition, my client would not oppose your clients' recovery of all sums deposited in the Court by the Nimkies, as well as any amounts paid by the Nimkies to the commissioner.

Ms. Dimiceli would be willing to provide a release of your clients' claims, which includes a joint tortfeasor release, and would expect to receive the same from your clients.

Steven B. Jacobson, Esq.
March 13, 1996
Page 3

If we can resolve this matter on the terms outlined above, Ms. Dimiceli would be also willing to agree to ask the SBA to waive its right to redeem the Princeville property. Frankly, we believe that has significant value to your clients because of the likelihood, if not the certainty, that the SBA would otherwise exercise that right rather than allow your clients to retain the property for a price so far below its actual value. The house is clearly the immediate source of payment of the bulk of the Morgans' claims.

You have also asked that Ms. Dimiceli agree to never again say that Mr. Morgan attended a fundraiser at the Princeville property. As you know, Ms. Dimiceli insists that is true as much as Mr. Morgan insists that it is not. Several other witnesses agree with her, including Dennis Nimkie. As for Mr. Vandeveer, I believe his relationship with Mr. Morgan has driven him to deny that happened for whatever reason is convenient at the moment. His newfound recollection that Mr. Morgan is not the person he thought he was is not only difficult to believe of a fellow Lion who lived in Princeville, but is simply a different excuse for Mr. Vandeveer to avoid contradicting Mr. Morgan. I have heard several different excuses now concerning why Mr. Vandeveer has changed his story. In any event, my client is willing to agree not to say that again except to the extent, in whatever setting, she is required to explain the position which she took in this litigation. Such an explanation, for example, might very well be necessary in the context of pursuing claims against Kerr or the Nimkies. Apart from that circumstance, she cannot see a setting in which that topic would even be raised.

I believe that you have sworn testimony explaining, in detail, Ms. Dimiceli's financial condition as well as, from this letter, an explanation of the errors of the rumors which your clients had heard. I also believe that subordination of my client's claims to the Morgan judgment would achieve your clients' objectives of insuring that they recover first from Nimkies and Kerr. Please let me know if we can conclude a settlement.

Very truly yours,

DWYER IMANAKA SCHRAFF KUDO
MEYER & FUJIMOTO

Paul A. Schraff

PAS:bcf
0078534.02
cc:   Ms. Rosetta Dimiceli